## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:19 CR 128 MOC WCM

UNITED STATES OF AMERICA       )
                                            )         **ORDER**

v.                                                 )

                                               )

PAUL MARTIKAINEN             )

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ )

This matter is before the Court for a determination of whether, pursuant to 18 U.S.C. §4241(d)(2)(A), Defendant should be committed for an additional period of time so that his competency can be restored.

## I.    Relevant Background

On November 1, 2019, Defendant was charged in a criminal complaint with one count of Interstate Threatening Communication in violation of 18 U.S.C. §875(c). Doc. 1.[1] Defendant made his initial appearance on November 4, 2019, but the hearing was not completed due to Defendant's disruptive behavior.

On November 8, 2019, Defendant again appeared before the Court, and the Court granted Defendant's request for the appointment of counsel. The Government made an oral motion that Defendant be evaluated for competency

---

[1] A Bill of Indictment was filed on December 3, 2019 charging Defendant with one count of Interstate Threatening Communication in violation of 18 U.S.C. §875(c). Doc. 14.

and defense counsel joined that request. The Court granted the motion and committed Defendant to the custody of the Attorney General for placement in a mental health facility for a competency evaluation. Doc. 10.

On November 12, 2019, Defendant filed a Notice of Insanity Defense under Rule 12.2 of the Federal Rules of Criminal Procedure. Doc. 9.[2]

On March 12, 2020, a Forensic Evaluation ("Competency Report") prepared by Dr. Graney was filed. Doc. 16. In the Competency Report, Dr. Graney stated that Defendant was "currently suffering from a mental disease or defect, namely Schizoaffective Disorder, Bipolar type," which rendered him unable to understand the nature and consequences of the proceedings against him, and to assist properly in his defense. Doc. 16 at 9. Following a hearing, Defendant was found incompetent to stand trial, and was committed to the custody of the Attorney General for treatment in a medical facility for a period not to exceed four months to determine whether there was a substantial probability that Defendant could be restored and attain the

---

[2] Following the filing of Defendant's Notice, the Court granted a motion by the Government requesting that Defendant be evaluated concurrently for competency and sanity. Docs. 11 & 12. On August 3, 2020, a Forensic Evaluation Addendum- Mental State at the Time of the Offense prepared by Dr. Dawn Graney, Psy.D., was filed. Doc. 22. Dr. Graney concluded that "at the time of the commission of the acts constituting the instant offense, Mr. Martikainen did suffer a severe mental disease or defect which made him unable to appreciate the nature and quality or the wrongfulness of his acts." Doc. 22 at 6.

Case 1:19-cr-00128-MOC-WCM   Document 52   Filed 03/09/21   Page 2 of 29

capacity to permit the proceedings to go forward in the foreseeable future. Doc. 18.[3]

On November 19, 2020, a Forensic Evaluation ("Restoration Report") prepared by Anna Abate, M.A., and Dr. Kristina P. Lloyd, Psy.D, ABPP, at FMC Butner was filed. Doc. 29. In the Restoration Report, the evaluators advised that "due to the lack of prior mental health records, thee [sic] is insufficient medical and psychological information to determine if there is a substantial likelihood Mr. Martikainen can be restored to competency with medication." Id. at 9. Thus, the evaluators asked the Court to allow Defendant's records from Haywood Regional Medical Center and Harris Regional Hospital to be released to them so that, in consultation with psychiatry staff, FMC Butner could determine whether Defendant's competency could be restored. The evaluators further advised, however, that if the request for additional records was denied, their opinion was "that Mr. Martikainen is not competent to proceed and cannot be restored to

---

[3] On July 14, 2020, a letter from the complex warden of the Federal Correctional Complex in Butner, North Carolina advised that Defendant was admitted to the mental health unit at Federal Medical Center Butner ("FMC Butner") on July 7, 2020, and that facility officials had calculated that his evaluation period would end on November 3, 2020. Doc. 19. Thereafter, defense counsel filed a Motion for Release, arguing that the four-month evaluation period pursuant to 18 U.S.C. §4241(d)(1) had expired. Doc. 20. Following briefing and a hearing on the Motion, the undersigned denied the Motion for Release. Doc. 26. The District Court affirmed that ruling following an appeal by Defendant. Doc. 27.

3

competency." Id. at 10.

On January 7, 2021, the Court issued an Order which granted the Government's request for a hearing to determine whether Defendant should be hospitalized for an additional period under 18 U.S.C. §4241(d)(2)(A), authorized the Government to release Defendant's medical records to FMC Butner, and directed FMC Butner to produce a supplemental report after reviewing the medical records. Doc. 36. Additionally, the January 7, 2021 Order denied without prejudice a motion by the Government for a hearing regarding involuntary medication pursuant to Sell v. United States. Id.[4]

On January 13, 2021, a Forensic Addendum ("Restoration Addendum"), prepared by Ms. Abate and Dr. Lloyd, was filed. Doc. 40. In the Restoration Addendum, the evaluators stated that Defendant was "currently suffering from a mental disease or defect, namely schizoaffective disorder, which renders him not competent to stand trial," but that "[i]nsofar as his symptoms have remitted in the past with antipsychotic medication, it is our further opinion there is a substantial probability his competency can be restored with

---

[4] The January 7, 2021 Order also denied a renewed motion for release by Defendant, Doc. 33, and directed defense counsel to advise whether Defendant was seeking a detention hearing. Subsequently, the Government filed a request asking that the Court permit any witnesses from the medical staff at FMC Butner to testify remotely and defense counsel filed an unopposed motion requesting that Defendant remain housed at his current BOP placement and that the upcoming hearings be conducted remotely. Docs. 37, 38. The undersigned allowed those motions in an Order entered on January 11, 2021. Doc. 39.

4

continued treatment." Doc. 40 at 5. Although the evaluators proposed treatment with antipsychotic medication, they advised that Defendant "continues to refuse any recommended medication treatment on a voluntary basis," and "that less intrusive means of treatment, such as psychotherapy, are not likely to restore his competence." Id. Additionally, they explained that because Defendant "has been free from aggressive or self-destructive behavior since his arrival at FMC Butner…there is no convincing evidence Mr. Martikainen currently poses a substantial risk of dangerousness in the current conditions of his confinement at FMC Butner." Id. For that reason, the evaluators found that Defendant did not meet the criteria for involuntary treatment under Washington v. Harper, 494 U.S. 210 (1990), and therefore "the only mechanism by which the Bureau of Prisons (BOP) is able to pursue his treatment is for this Court to make a ruling within the parameters established in Sell v. United States." Id. The evaluators requested that if the Court were to consider involuntary medication under Sell, that FMC Butner be ordered to submit a Forensic Treatment Plan detailing the proposed treatment and addressing some of the Sell factors. Id. at 6.

On January 14, 2021, a treatment plan prepared by Dr. L. Graddy, Chief Psychiatrist at FMC Butner ("Treatment Plan") (Doc. 41) was filed, as was an FMC Butner Sell Appendix 2021 (Doc. 42). In the Treatment Plan, Dr. Graddy stated that Defendant was "unable to develop therapeutic relationships with

5

staff due this extreme irritability and delusional beliefs." Doc. 41 at 1.

Additionally, Dr. Graddy explained that Defendant had previously been hospitalized at Haywood Regional Medical Center from May 30, 2018 to June 18, 2018 "for delusions, hallucinations, and bizarre behavior" and that he had been treated with the antipsychotic aripiprazole[5] orally beginning on June 1, 2018, for approximately two weeks. Id. at 2. While treated, "[h]is symptoms improved but did not fully remit" and he received "a long-acting injection of aripiprazole" before he was discharged.[6] Id. Reportedly, one month after discharge Defendant received "one additional injection of aripiprazole in the community" before stopping the medication. Id. Dr. Graddy reported that as a result of treatment with aripiprazole, Defendant experienced "[p]artial remission of symptoms" and "reportedly experienced improvement in his demeanor, a decrease in disorganized behavior, an improved ability to care for himself, and improved ability to hold an appropriate conversation. He was also able to engage in some prosocial activities with his social supports." Id. at 3. The only listed side effect during treatment was "[e]levated blood pressure," though it appeared that Defendant's blood pressure was elevated before he

---

[5] This drug is also known by the brand name "Abilify."

[6] The Treatment Plan indicates both that Defendant was hospitalized until June 18 and that he was discharged on June 15. It is not clear when Defendant was released from the hospital; however, at the time of his discharge, "he was still experiencing delusions." Doc. 41 at 2.

6

began receiving aripiprazole. Id.

Further in the Treatment Plan, Dr. Graddy recommended that Defendant again be treated with aripiprazole, and with appropriate adjunctive treatments, as needed. Id. Dr. Graddy explained that Defendant's mental illness "should respond to appropriate treatment," that Defendant "appears to belong to a population of patients that are able to attain competency about 70-80% of the time with treatment," and that "[a]vailable information suggests [Defendant] responded positively to a relatively brief course of medication treatment in the past." Id. Accordingly, although Defendant's "symptoms did not remit" while he was treated with aripriprazole, the Treatment Plan concluded that "treatment with an agent that he has responded to, and tolerated well in the past (aripiprazole), appears the most prudent and appropriate course of action." Id. at 3-4.

Additionally, Dr. Graddy identified the expected benefits of aripiprazole as being "[a] decrease in [Defendant's] symptoms of mental illness and an increase in mental functioning," and explained that "the most probable and concerning side effect" would be neuromuscular in nature, including akathisia (a sense of inner restlessness and inability to sit still). He also noted a risk of headache and "a low risk of very serious side effects, including death." Id. at 4. The Treatment Plan further provided that such risks would be mitigated "through careful observation," and lowering the dose of the medicine or using

7

adjunctive medications, if necessary. Id.

On January 21, 2021, the Court issued an Order granting a second request by the Government for a Sell hearing, and deferring consideration of Defendant's request for a detention hearing until after the resolution of the Sell issues. Docs. 43, 44, & 47.[7]

On February 3, 2021, an updated version of the FMC Butner Sell Appendix 2021 ("Second Sell Appendix") was filed. Doc. 50.[8] The document provided scientific information intended to assist with the Sell analysis. Doc. 50 at 1. It explained that schizophrenia is a serious, but relatively common illness, and that while side effects are possible in the treatment of schizophrenia, the illness "results in higher rates of early death in afflicted individuals than the general population" and "can result in a life expectancy at least a decade shorter than someone without" schizophrenia. Id. at 1-2. Treatment with antipsychotic medication can mitigate some of this risk, and "was actually associated with a reduced risk of dying." Id. at 2. Additionally, the Second Sell Appendix provided that in a study of people involuntarily medicated under Sell, 62 of 81 people with schizophrenia (76%) and 18 of 22

---

[7] The January 21, 2021 Order also allowed Defendant and defense counsel to participate in the hearing remotely from FMC Butner. On January 24, 2021, however, defense counsel filed a motion asking the Court to allow her to appear in person for the Sell hearing while Defendant appeared remotely from FMC Butner. Doc. 48. On January 26, 2021, the Court granted that motion.

[8] This document was materially the same as the first Sell Appendix (Doc. 42).

people with schizoaffective disorder (81.8%) treated with antipsychotics were restored to competency. Id. Finally, the Second Sell Appendix recognized that antipsychotic drugs carry the risk of causing neuromuscular side effects, weight gain, diabetes or high cholesterol, as well as the risk of rare but more serious side effects, including sudden death. Id. at 4-6.

## II. The Hearing

The undersigned conducted a hearing on February 3, 2021. Deputy Criminal Chief Don Gast appeared for the Government and Assistant Federal Public Defender Mary Ellen Coleman appeared for Defendant.

### A. Defendant's Presence and Participation

Defendant attended the hearing via video conference from FMC Butner, where he was housed. Specifically, Defendant was seated in the same room at FMC Butner from which the Government's witnesses were testifying. At one point, Defendant became disruptive and was warned about further disruptive behavior. Shortly thereafter, Defendant began speaking again while testimony was being offered and then voluntarily left the room. Nonetheless, the video link with FMC Butner remained connected for the remainder of the hearing in the event Defendant wished to return to the room and hear additional parts of the hearing. He did not return, however.

### B. The Evidence

The Government called four witnesses: Dr. Lloyd, a forensic psychologist

9

at FMC Butner; Dr. Graddy, chief psychiatrist at FMC Butner; FBI Agent Kaley Kowalsky; and Ruth Foy, Defendant's sister.

### 1. Dr. Lloyd's Testimony

Dr. Lloyd testified that Defendant suffers from schizoaffective disorder, remains incompetent to stand trial, has often been unwilling to engage with treatment staff, and has refused to take medication. She believed that Defendant could not be restored without medication, noting that he had been unmedicated during the time he had already spent at FMC Butner and had not been restored. In addition, because his mental illness was so pervasive, he could not participate in reciprocal conversation, would not listen to information, and spoke over staff such that therapy without medication would not be effective.

Dr. Lloyd stated that previously Defendant had improved while taking medication and that medication may help him engage in conversation, both in therapy and with his attorney. She acknowledged, however, that when Defendant had been medicated, his symptoms had improved but had not remitted, and that he still had delusional beliefs. Additionally, she testified that she had raised the subject of medication with Defendant, and on one occasion when she did so he stormed out of the room.

Finally, Dr. Lloyd explained that Defendant was not dangerous at the FMC Butner facility. He had been free of aggressive or self-harming behaviors,

10

lived in an open housing unit, and periodically participated in a competency group. While some of his previous roommates had expressed concerns about being housed with him, he had not actually engaged in any violent or assaultive behavior.

### 2. Dr. Graddy's Testimony

Dr. Graddy agreed with the diagnosis of schizoaffective disorder and agreed that Defendant was incompetent to stand trial. He explained that he had attempted to meet with Defendant several times, but had difficulty communicating with him, in part due to Defendant's irritability. Dr. Graddy attempted to offer medication without agitating Defendant, but he was not successful; every time he did offer medication, Defendant declined.

Consistent with the Treatment Plan, Dr. Graddy recommended involuntary medication with aripiprazole, the medication Defendant had received in the past. He testified that when Defendant had been medicated with aripiprazole, he showed good improvement at the hospital and his family indicated that he continued to improve after he was released, which suggested that Defendant could attain competency. While there were other anti-psychotic medications available, Dr. Graddy recommended aripiprazole because it was commonly prescribed and effective and had relatively few side effects. He believed based on personal experience, the general literature on anti-psychotic medications, and the literature on restoration, that aripiprazole was the best

option. Further, because the best predictor of whether a medication would work was a past response and because Defendant had previously shown improvement when treated with aripiprazole, he testified that a good prognosis was expected here with aripiprazole.

Dr. Graddy's specific plan was that Defendant would receive 400 mg of aripiprazole by injection every four weeks. He stated that it would take a month or two for the medication to reach a therapeutic level and approximately five injections for the medication to reach a steady state in the blood. As the level of medication in Defendant's body rose, Defendant's symptoms were likely to abate and he was likely to become competent. Dr. Graddy opined that it was highly likely that Defendant would be restored within 6 months. Overall, Dr. Graddy concluded that forced medication with aripiprazole was substantially likely to render Defendant competent, and Defendant was unlikely to attain competency without medication.

Dr. Graddy also addressed potential side effects of aripiprazole, with the most common being headache, nausea, and akathisia. Headaches and nausea were likely to resolve with continued treatment, while akathisia would need to be treated with supplemental medication or by reducing the dose of aripiprazole. The most serious potential side effect was sudden death, but that was uncommon and unlikely to occur. Despite the potential for side effects, Dr. Graddy believed that aripiprazole was the best medication for Defendant

because he had taken it before with few, if any, side effects. Specifically, although Defendant had complained of high blood pressure when he had first taken aripiprazole while at the hospital, medical records indicated that Defendant had elevated blood pressure before he began taking the medication. Further, Dr. Graddy stated that if Defendant developed high blood pressure or other side effects, FMC Butner could help him manage those conditions and that they would be unlikely to affect a trial.

Dr. Graddy opined that medication would be both medically appropriate and in Defendant's best interest. He stated that schizophrenia is both common and severe, and that schizophrenic patients have shorter life spans by 12-25 years and are more likely to be victims of violent crime. On the other hand, when treated with antipsychotics, patients live longer, and their quality of life is improved.

Dr. Graddy explained if an order for involuntary medication was entered, before administering the medication, he would first offer to allow Defendant to take the medication voluntarily. If Defendant refused, Defendant would be handcuffed and placed in a chair. Dr. Graddy would discuss the medication with Defendant and encourage Defendant to verbalize his objections. If Defendant still did not accept the medication voluntarily, he would be held, and the shot would be forcibly administered.

13

### 3. Agent Kowalsky's Testimony

Agent Kowalsky investigated the underlying charge against Defendant. She testified that Defendant made numerous calls to the Coast Guard and made graphic and violent threats. Within a span of 26 hours beginning on October 9, 2019, Defendant made 42 calls to the Coast Guard and 442 calls to other agencies. More generally, in October 2019, Defendant made calls to 13 states, 24 cities, and 39 organizations, agencies, or individuals, including schools, colleges, fire departments, TV stations, and FBI offices. While not all of these calls included explicit threats, they involved "concerning communications," such as indications that a bomb was present. The majority of the institutions Defendant called had to close, evacuate, and/or search their facilities, to significant civic cost.

However, there was no indication that Defendant traveled to any of the places to which he made calls and no firearms were found in his home. Nor were any explosive devices found at any of the locations Defendant called.

### 4. Ms. Foy's Testimony

Ms. Foy is Defendant's sister, and they have a close relationship. Previously, Defendant lived in Florida, with his wife and young son. He was laid off and lost his home, and when he and his wife divorced, she maintained primary custody of their son. In 2009, Defendant attempted to abduct his son and take him to Mexico on a boat; he was stopped by the Coast Guard, arrested,

14

and incarcerated. After he was released, he moved to Bryson City to be closer to Ms. Foy.

Defendant first lived with Ms. Foy and then moved into his own home, which he maintained, and got a job. While Ms. Foy reported noticing some "bipolar-type tendencies," Defendant remained relatively stable. Ms. Foy explained, however, that Defendant "spiraled" after losing his job and being robbed by a friend. In 2018, he "started to go off the rails."

At first, she was concerned that he was using drugs and had him tested, but except for some mild marijuana use, Defendant tested negative. As time passed, he grew more delusional. However, Defendant did not seek medical intervention.

On one occasion in early 2019, Defendant was found sitting on his roof. His speech was illogical and pressured and he was exhibiting tics and jerks. Ms. Foy reached out to a doctor, who had Defendant involuntarily committed at Harris Regional Hospital. Defendant was diagnosed with schizoaffective bipolar disorder. The only medication he received was Ativan, to calm down, and once he became "cold and quiet," it was determined that he was not a danger to himself or anyone else and he was released.

On another occasion, in June 2019, Defendant arrived at Ms. Foy's home at approximately 2:00 a.m. He told her that he had been "radiated" by aliens, and that he had only 30 minutes to live. He wanted her to call 911 and

screamed at her until she did. He was picked up by an ambulance and taken first to Swain County Hospital and then to Haywood Regional Medical Center. He was committed for 30 days pursuant to a court order but was released early because he agreed to accept an antipsychotic injection at the facility, followed by three outpatient injections (of which he later ended up taking only one).

Ms. Foy reported that two weeks after the initial injection, Defendant was calmer, started caring more about his hygiene, and engaged in more normal conversation. Defendant voluntarily went to a medical provider to take the first injection one month after his discharge and his symptoms continued to improve: he started eating, grew concerned about his presentation, became more interested in working outside, started repairing his home, and expressed a desire to go back to work. He did not complain to Ms. Foy of any side effects, and the only effects she saw were positive, like body jerks and tics fading away.

When Defendant was due for his second outpatient injection, he independently went to his medical provider. However, he tried to negotiate for the medication to be given in pill form rather than by injection. When his request was refused, he left without any kind of medication. After this, his symptoms returned within three to four weeks "with a vengeance." As a result, Ms. Foy established a temporary guardianship over Defendant to take care of his mortgage, handle his bills, and maintain his essential needs. She applied for and secured disability benefits for him. As Defendant's symptoms

16

increased, Ms. Foy continued to see him, take him things he needed, and help take care of his home.

Ms. Foy stated that she believed involuntary medication was the only option for Defendant and that it was in his best interest.

## III. Discussion

Previously, Defendant was committed under 18 U.S.C. §4241(a) for a competency evaluation. After Defendant was deemed incompetent to stand trial, he was committed under 18 U.S.C. §4241(d)(1) to determine whether there was a substantial probability that his competency could be restored. Pursuant to 18 U.S.C. §4241(d)(2)(A), Defendant may now be committed for an additional reasonable period of time until "his mental condition is so improved, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward."

### A. Legal Standards

#### 1. Section 4241(d)(2)(A)

"'Substantial probability' does not have an agreed upon definition." United States v. Brown, 352 F. Supp. 3d 589, 593 (E.D. Va. 2018); compare Brown 352 F. Supp. 3d at 595 (finding that "substantial probability" lies somewhere between preponderance of the evidence and clear and convincing) with United States v. Loughner, 672 F.3d 731, 770 (9th Cir. 2012)

17

(finding that "substantial probability" is less than a preponderance of the evidence).

Here, however, the Section 4241 inquiry does not stand alone but is intertwined with questions regarding the involuntary medication of Defendant. The medical witnesses were unanimous in their opinion that the only way Defendant could be restored was with medication and that forcible mediation was required. The Government likewise argued that medication was a prerequisite to restoration in this case, and that a <u>Sell</u> order was necessary. Defense counsel agreed that Defendant could not be restored without medication.

Accordingly, the "substantial probability" requirement of Section 4241(d)(2)(A) must be considered in tandem with the <u>Sell</u> standard.

## 2. <u>Sell</u> Standard

An individual has a significant, constitutionally protected liberty interest in "avoiding the unwanted administration of antipsychotic drugs." <u>Sell v. United States</u>, 539 U.S. 166, 178 (2003) (internal quotation marks omitted). However,

> "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial,

18

and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."

> Sell, 539 U.S. at 179.

Because the deprivation of liberty is so severe, forcible medication "is the exception, not the rule." United States v. Watson, 793 F.3d 416, 419 (4th Cir. 2015) ("forcible medication under Sell is a tool that must not be casually deployed, and courts must be vigilant to ensure that such orders, which carry an unsavory pedigree, do not become routine"); United States v. Brown, 820 Fed. Appx 214, 221 (4th Cir. 2020) ("The forcible medication of a defendant for the purpose of making him competent to stand trial is a drastic step that must pass a demanding test").

Forcible medication for the sole purpose of restoring competency is appropriate only if "(1) 'important governmental interests are at stake'; (2) 'involuntary medication will significantly further those concomitant state interests'; (3) 'involuntary medication is necessary to further those interests'; and (4) 'administration of the drugs is medically appropriate.'" Brown, 820 Fed. Appx. at 219 (quoting Sell 539 U.S. at 180-81).

Further, "[b]ecause the involuntary administration of antipsychotic drugs for purposes of trial competence implicates both a person's significant liberty interest in avoiding unwanted drugs and the public's interest in prosecuting crimes," the Government must demonstrate the need for

19

involuntary medication by clear and convincing evidence. <u>United States v. Bush</u>, 585 F.3d 806, 814 (4th Cir. 2009). "That is a heavy burden, requiring evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, or evidence that proves the facts at issue to be highly probable." <u>Watson</u>, 793 F.3d at 420 (internal quotations omitted).

### B. Analysis of the Sell Factors

#### 1. Government's Interest

"The government's interest is 'important' if the defendant is both charged with a 'serious crime; and '[s]pecial circumstances' do not undermine the government's interest in trying him for that crime." <u>United States v. Evans</u>, 404 F.3d 227, 236 (4th Cir. 2005); <u>see also</u> <u>Sell</u>, 539 U.S. at 179 (if the defendant has been confined for a significant amount of time and would receive credit for that time towards any sentence imposed or if the defendant is facing lengthy civil commitment, the Government's interest in prosecution may be diminished).

The Fourth Circuit has found, "without establishing a hard and fast rule," that crimes that carry a 10-year statutory maximum punishment are "serious." <u>See</u> <u>United States v. White</u>, 620 F.3d 401, 410 (4th Cir. 2010).

Here, Defendant is charged with one count of making a threat to kidnap and injure another person in violation of 18 U.S.C. §875(c). Defendant points

out that the statutory maximum punishment for that offense is 5 years, 18 U.S.C. §875(c), and further argues that the offense "has no elements requiring the use of force." Doc. 33 at 18. The Government contends that the nature of Defendant's threatening behavior had a considerable civic cost in that it inspired fear, wreaked havoc, and caused agencies and organizations to close, evacuate, and conduct searches in communities across the country.

While neither party has provided specific authorities addressing whether a 5-year statutory maximum sentence should be considered "serious" for purposes of a <u>Sell</u> analysis, the undersigned will assume that Defendant has been charged with a "serious" crime; however, as discussed below, special circumstances undermine the Government's interest in trying Defendant for that crime.

Defendant's potential sentence, if he is restored to competency and convicted, should be considered, as should the possibility that Defendant could "be found not guilty and that the entirety of [his] pre-trial detention will remain uncredited time." <u>White</u>, 620 F.3d at 418.

If Defendant is restored and convicted, by defense counsel's calculations, Defendant's Sentencing Guideline range, without a plea bargain or downward departure for acceptance of responsibility, would be 33-41 months.[9] Defendant

---

[9] The Government conceded that Defendant's Guideline range was "not very long," but did not provide a specific competing calculation.

has been incarcerated for over 15 months and restoration efforts, as described by Dr. Graddy, would require an additional commitment of approximately six months. Appellate proceedings regarding a <u>Sell</u> order could also prolong Defendant's incarceration. <u>See</u> <u>White</u> 620 F.3d at 414 (if the Fourth Circuit affirmed the district court's <u>Sell</u> order, a petition for rehearing en banc and a petition for certiorari to the Supreme Court "could persist for many months, however, and even assuming quick and consistent denials, such proceedings would cause [Defendant] to remain detained for at least an additional six months"). Accordingly, assuming a Guideline range of 33-41 months, it is possible that Defendant could be facing relatively little additional time in custody if he were restored and convicted. <u>See</u> <u>Rodman</u>, 446 F. Supp. 2d at 496 (finding the Government did not have a strong interest in pursuing a trial, because "Defendant has already been confined for almost the entire term to which he would be sentenced under the Sentencing Guidelines if convicted").

Next, and significantly, the Government has acknowledged that it would like to resolve this case through a pretrial diversion agreement, rather than through trial. Such an agreement would not require Defendant to spend any more time in custody; instead, Defendant would be required to accept medication and treatment for his mental illness. The undersigned appreciates the Government's candor in this regard. However, the Fourth Circuit has sometimes formulated the inquiry under the first <u>Sell</u> factor as "the

22

government's interest in bringing a mentally incompetent defendant *to trial*."

Evans, 404 F.3d at 235 (emphasis added); see also White, 620 F.3d at 409 ("for the purpose of rendering a defendant competent to stand trial"); Bush, 585 F.3d at 813 ("the government has a significant interest in bringing a person accused of a serious crime to trial"), and the parties have not provided authorities indicating that Sell authorizes forced medication for the purpose of allowing a defendant to enter into a pretrial diversion agreement. Nevertheless, should Defendant be restored and enter into such an agreement, he would be facing no further time in custody.

Further, as noted above, Defendant has filed a Notice of Insanity Defense and the staff at FMC Butner have opined that Defendant was not sane at the time of the alleged commission of the offense. See Doc. 22 at 6. The possibility of a successful insanity defense is a special circumstance to be considered under the first Sell factor. See e.g., United States v. Duncan, 968 F. Supp. 2d 753 (E.D. Va. 2013), United States v. Rodman, 446 F. Supp. 2d 487 (D.S.C. 2006). If Defendant were found not guilty by reason of insanity or for any other reason, he would face no additional time in custody, though he could face civil commitment under 18 U.S.C. §4243.[10]

----

[10] Similarly, the Government argued that although Defendant was not deemed to be dangerous for purposes of his commitment at FMC Butner, he would likely be found dangerous to people or property and face a period of commitment under 18 U.S.C. §4246. Such a finding has not been made, but this possibility mitigates the

Based on the above considerations, the undersigned concludes that this factor favors Defendant.

**2. Significantly Furthered**

Under the second factor, the Government must show that its interests will be "*significantly further*[ed]" – "that administration of the drugs is substantially likely to render the defendant competent to stand trial" and "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181.[11]

"The government must propose a course of treatment in which it specifies the particular drug to be administered." Evans, 404 F.3d at 240. "[I]n order to satisfy this second factor of the *Sell* test, the government must not only show that a treatment plan works on a defendant's type of mental disease *in general,* but that it is likely to work on this defendant *in particular.*" Bush, 585 F.3d at 816 (emphasis in original); see also Watson, 793 F.3d at 424 ("Merely

---

Government's interest in further prosecution.

[11] Here, as discussed above, the Government has expressed an interest in restoring Defendant's competency not to proceed to trial, but instead to allow resolution of this case through a pretrial diversion agreement. It is unclear whether such interest fits within the parameters of Sell. For purposes of the remaining three Sell factors however, the undersigned will assume that such an interest is within the scope of Sell.

showing a proposed treatment to be 'generally effective' against the defendant's medical condition is insufficient to meet this burden").

Here, Dr. Graddy identified a specific treatment plan: one injection of 400 mg of aripiprazole every four weeks with a transition to the equivalent amount of oral medication if Defendant became willing. He also testified that aripiprazole was effective for Defendant in the past.[12] However, it appears that although Defendant's delusions abated when previously treated with aripiprazole, they did not remit entirely, and it is not known whether he became competent to the extent necessary to stand trial even when treated. Nevertheless, based on the progress documented in medical records, Dr. Graddy was confident that Defendant could be restored in approximately 6 months.

With respect to potential side effects, the only side effect that Defendant reported when he previously took aripiprazole was high blood pressure, which was not corroborated by the medical evidence. Otherwise, there is no indication in his medical records that Defendant experienced negative side effects from the aripiprazole, and Ms. Foy stated that Defendant did not report side effects to her.

---

[12] Additionally, Defendant's sister testified that when medicated with aripiprazole, Defendant's body tics and jerks stopped, and he was calmer, cared about his hygiene and presentation, started eating, carried on more normal conversations, and began to demonstrate an interest in working.

25

Overall, as the Government has demonstrated that aripiprazole is substantially likely to be effective, considering Defendant's specific condition and history, and that it would not produce side effects that are substantially likely to significantly interfere with Defendant's ability to assist counsel at trial, the Government has satisfied this factor.

### 3. Necessary

Under the third factor, involuntary medication must be "necessary" in that "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." Sell, 539 U.S. at 181.

Both Dr. Lloyd and Dr. Graddy opined that medication was the only way to restore Defendant. Dr. Lloyd stated that Defendant did not seem capable of engaging in conversation or therapy and Dr. Graddy explained that he had attempted to raise the subject of medication with Defendant several times, but that Defendant had grown agitated and refused to discuss the subject or accept medication voluntarily. Defendant's sister, Ms. Foy, stated that she did not believe Defendant would take medication voluntarily because he did not recognize his own condition.

At the same time, there is information in the record that contempt orders can prompt a patient to take medication voluntarily.[13] Further, Dr. Graddy

---

[13] The Second Sell Appendix described three cases at FMC Butner where an

explained that when a <u>Sell</u> order is issued, a patient will often agree to accept the medication voluntarily after all, and that this could happen in Defendant's case.

In addition, the record indicates that when Defendant was involuntarily committed to Haywood Regional Medical Center, in order to be released sooner, he voluntarily agreed to take the medication now proposed.

Whether the Government has met its burden under the <u>third</u> Sell factor presents a close question. However, while Defendant has refused to accept medication voluntarily from FMC Butner staff, and even to engage in conversation about it at times, in light of the lack of more specific information regarding the attempted discussions with Defendant, and particularly whether Defendant has been advised as to how his decision to accept or reject medication could impact the length of his commitment, the undersigned is persuaded that a finding in favor of Defendant on this factor is warranted.

### 4. Medically Appropriate

Under the fourth <u>Sell</u> factor, "the court must conclude that administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." <u>Sell</u>, 539 U.S. at 181.

---

incompetent defendant was presented with a court order "for refusing to comply with court ordered psychiatric treatment." Doc. 50 at 10. In one of the three cases, "the defendant reluctantly accepted the medication treatment." <u>Id</u>.

(emphasis in original).

The Government has met its burden under this factor. Defendant has been diagnosed with schizoaffective disorder. As Dr. Graddy explained, people with this type of disorder have shorter life expectancies than the average population and use of medication typically increases life expectancy as well as quality of life. The benefits of medication have been demonstrated with Defendant—his sister reported than when he was medicated in the past, Defendant's tics and jerks stopped, he was more interested in hygiene and self-care, and more able to have normal conversations and function in everyday life. Other than the risk of rare side effects, there is no reason to believe that medicating Defendant is not in his best medical interest.

## IV. Conclusion

For the reasons described above, the undersigned concludes that all of the standards required for the involuntary medication of Defendant are not supported by clear and convincing evidence and thus declines to issue an order that Defendant be medicated against his will. The undersigned further concludes that there is not a substantial probability that Defendant will be restored and, thus, that Defendant should not be committed for an additional period pursuant to 18 U.S.C. §4241(d)(2)(A). The Government's request for this relief is therefore denied.

28

The Clerk is respectfully directed to set a status hearing with counsel to discuss the next procedural steps, including consideration of Defendant's Request for Detention Hearing (Doc. 43) and any motions that may be made pursuant to 18 U.S.C. §4246.

It is so ordered.

Signed: March 8, 2021

W. Carleton Metcalf
United States Magistrate Judge